IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA ROBERTS, | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:21-CV-00299-TFM-C |
| GULF DISTRIBUTING HOLDINGS, LLC, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b) and S.D. Ala. Gen. L.R. 72(a)(2)(S), on Defendant Gulf Distributing Holdings, LLC's ("Defendant" or "Gulf") Motion for Summary Judgment and supporting memorandum (Docs. 26 and 26-1) filed on June 24, 2022. As discussed herein, after being provided proper notice and ample time, Plaintiff Joshua Roberts ("Plaintiff" or "Roberts"), appearing *pro se*, did not file a response in opposition to the Motion for Summary Judgment. Upon consideration of Defendant's supporting memorandum and the parties' respective arguments presented during the hearing held on August 25, 2022, it is recommended that Defendant's Motion for Summary Judgment should be GRANTED.

I.      PROCEDURAL BACKGROUND

Roberts initiated this action on July 6, 2021 by filing a form Complaint accompanied by a two-page summary of factual allegations. (Doc. 1). Although Gulf challenges whether Roberts' Complaint adequately pleads certain claims, Gulf concedes for purposes of its Motion for Summary Judgment that Roberts (African-American) has asserted claims for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended. In support of his claims, Roberts alleges he was subjected to discriminatory treatment by his former manager, Charles Lang ("Lang"), and after reporting the incidents he was suspended from work, reassigned to a different position, and eventually terminated.

On June 24, 2022, Gulf filed its Motion for Summary Judgment and supporting memorandum (collectively, the "Motion"). (Docs. 26 & 26-1). On June 28, 2022, the Court entered an Order instructing that "[a]ny party opposing this motion must file their response in opposition on or before July 18, 2022." (Doc. 27). The Order provides a detailed explanation of the summary judgment procedure under Rule 56, including the importance of filing responsive materials and the consequences of failing to file an appropriate response. (Doc. 27, PageID.263-64). Roberts did not file a response on or before July 18, 2022. On July 29, 2022, the Court referred the Motion to the undersigned Magistrate Judge for disposition by report and recommendation. (Doc. 28). On August 1, 2022, the undersigned entered an Order setting the Motion for hearing on August 16, 2022. (Doc. 29). On August 15, 2022, the hearing previously scheduled on August 16, 2022 was rescheduled to August 25, 2022. (Doc. 30).

During the August 25, 2022 hearing, Roberts informed the Court that he did not receive Gulf's Motion shortly after it was filed on June 24, 2022. In response, Gulf advised the Court that

an electronic copy of the Motion was served on Roberts on June 24, 2022 via delivery to Roberts' email address on record and that on the same date, a paper copy was served on Roberts via delivery by U.S. Mail to Roberts' mailing address on record.[1] In any event, Roberts acknowledged during the summary judgment hearing that he at least had received the Motion by the time he received notice of the original August 16, 2022 summary judgment hearing, which as mentioned, was continued until August 25, 2022. Roberts also confirmed that he understood the need to file a response. Roberts offered no explanation for why he did not file a response to the Motion, but stated that he obtained affidavits from certain witnesses that support the alleged discriminatory conduct by Lang. Roberts failed to file the alleged witness affidavits and did not provide them to Gulf or the Court prior to or during the hearing. For the additional reasons discussed herein, even if Roberts were permitted to file the alleged witness affidavits supporting Lang's misconduct, this would not save his only actionable claims. Notwithstanding Roberts' failure to file a response to the Motion, the undersigned heard and carefully considered oral argument presented by both parties on Roberts' discrimination and retaliatory discipline and termination claims.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 , 247-48 , 106 S. Ct. 2505 , 2510 , 91 L. Ed. 2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not

---

[1] Following the hearing, Gulf filed proof of its service via email along with signed representations by Gulf's attorney confirming the email was delivered successfully with no error message and that the paper copy sent via mail also was not returned. (Doc. 33).

defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'").

The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) ("The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."). Once this initial demonstration is made, the "responsibility then devolves upon the non-movant[s] to show the existence of a genuine issue . . . [of] material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *see also Allen*, 495 F.3d at 1314 ("'When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.'"); *see Comer v. City of Palm Bay, Fla.*, 265 F.3d 1186 , 1192 (11th Cir. 2001) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits,'" depositions, answers to interrogatories, and admissions on file.'").

Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists. *Resolution Tr. Corp. v. Dunmar Corp*., 43 F.3d 587, 592 (11th Cir. 1995) (internal citations and quotations omitted), cert. denied sub nom; *see also Comer*, 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial."). As particularly applicable here, where the nonmovant fails to properly address any of the movant's properly supported facts, a court may consider the facts undisputed. Fed. R. Civ. P. 56(e)(2).

Accordingly, in considering whether Gulf is entitled to summary judgment in this case, the Court has viewed the facts in the light most favorable to Roberts. *Comer*, 265 F.3d at 1192. Additionally, based on Roberts' failure to file a response challenging the facts set forth in Gulf's Motion, all of which are properly supported by Gulf's accompanying evidentiary submission, the Court considers the following facts as undisputed. Fed. R. Civ. P. 56(e).

## III.    FACTUAL BACKGROUND

### A.    Gulf Distributing Holdings, LLC

Gulf is a beverage distributor located in Mobile, Alabama.  (Doc. 26-1 at ¶ 1, PageID.87). Gulf has a written Equal Employment Opportunity ("EEO") policy that prohibits discrimination based on race or any other protected characteristic.  (Doc. 26-2 at ¶ 5, PageID.117). The EEO policy outlines a mandatory complaint reporting procedure and instructs employees to report any incident of racially offensive conduct or discriminatory and/or retaliatory treatment to Gulf's

Human Resources ("HR") Director, or alternatively, to Gulf's Senior Vice President and General Counsel.   (Doc. 26-2 & Att. 1 to same, PageID.117-23).  The policy assures employees they will not be retaliated against for making a complaint or participating in the complaint procedure and that any act of retaliation will not be tolerated.  (Doc. 26-2 & Att. 1 to same; PageID.117-23).  In addition, Gulf's employee handbook, which is provided to all employees at the time of hire, prohibits fighting, intimidating, or instigating altercations with other employees.  (Doc. 26-8 at Att. 6, PageID.227 & Doc. 26-4 at ¶ 7, PageID.139).  The handbook also includes an attendance policy that encourages employees to schedule personal appointments before or after the workday or on scheduled days off.  (Doc. 26-8 at Att. 6, PageID.221-28).  Pursuant to the attendance policy, employees are required to submit requests for scheduled time off to their supervisor at least five days in advance to allow time for scheduling adjustments to ensure shifts are properly staffed.  (Doc. 26-8 & Doc. 26-8 at Att. 6, PageID.221-28.)  The attendance policy provides that "[a]ll requests for time off are subject to approval by the employee's supervisor on a case-by-case basis."   (Doc. 26-8 & Doc. 26-8 at Att. 6, PageID.221-28). Further, it states, "[n]otification of an absence to the supervisor does not automatically mean the absence is authorized. Any time off from work that is without permission of the supervisor is considered an unexcused absence and may result in disciplinary action, up to and including termination."  (Doc. 26-8 at Att. 6, PageID.221-28).

### B.    Plaintiff Roberts' Employment

On April 18, 2017, Gulf hired Roberts as a Load Crew Member assigned to work in the Warehouse Department earning $11.50 per hour. (Doc. 26-3, PageID.134-135; *see also* Doc. 26-

4, PageID.137-140). The Load Crew Member position is responsible for stocking inventory, loading and wrapping carts of inventory, and pulling and checking orders prior to the order being loaded onto trucks for delivery to Gulf's customers. (Doc. 26-4 at ¶ 3, PageID.137-138). There are various job assignments within the Load Crew Member position, including roles known as order picker/cart puller, checker, and loader. [2] (Doc. 26-4 at ¶¶ 3-4, PageID.137-38; *see also* Doc. 26-6, PageID.148-49). Which of the three roles a Load Crew Member performs on a particular day is determined by the Load Crew Manager and assigned based on need and the Load Crew Member's demonstrated job performance and experience. (Doc. 26-4 at ¶3, PageID.137-38; Doc. 26-6, PageID.154-55).

The checker role is a two-person job that requires working side by side with a co-worker and also requires working closely with other Warehouse employees, including loaders and drivers, to complete the loading process in accordance with Gulf's procedures and best loading practices (e.g., checking code dates to ensure oldest product is loaded first, space concerns on the trucks, directing and assisting with loading containers, etc.). (Doc. 26-6, PageID.179; Doc. 26-4 at ¶ 3, PageID #137-38). The checker role, unlike the other Load Crew Member roles, requires the use of heavy equipment, including forklifts and pallet jacks, and normally is assigned to Load Crew Members with more experience and who have demonstrated their ability to work efficiently and effectively in a team role. (Doc. 26-4 at ¶ 3, PageID.137-38; Doc. 26-6, PageID.150;

---

[2]     As used at Gulf, order picker is synonymous with cart puller (hereafter "picker"). (Doc. 26-6, PageID.178-79).

Doc. 26-7 at ¶ 3, PageID.196). Of the three roles, the picker's duties are the most independent and requires minimal teamwork. (Doc. 26-4 at ¶ 4, PageID.138).

When Roberts was first hired he worked on the day shift but later transferred to the night shift. (Doc. 26-3, PageID.134-36); Doc. 26-6, PageID.148). Night shift employees begin their shift at either 4:00 P.M. or 5:00 P.M., approximately. (Doc. 26-8 at ¶ 11, PageID.211). When Roberts transferred to the night shift he was assigned to the picker role and received a raise increasing his hourly rate to $13.50. (Doc. 26-6, PageID.148; *see also* Doc. 26-9, PageID.250). When Roberts transferred to the night shift Lang was the Load Crew Manager and Edward Pederson ("Pederson") was the night shift manager. (Doc. 26-6, PageID.158-59). Pederson was Roberts' immediate supervisor and Lang was above Pederson. (Doc. 26-6, PageID.158-59).

Domenic Olson ("Olson") is Gulf's Managing Director and acts as general manager of Gulf's Mobile facility responsible for overseeing all departments, including the Warehouse Department. (Doc. 26-7 at ¶ 2, PageID.196). On or about December 29, 2018, Roberts was reassigned from the picker role to the checker role and received a $0.75 raise increasing his hourly rate to $14.00. (Doc. 26-6, PageID.155; *see also* Doc. 26-9). In addition to his hourly pay, pursuant to Gulf's Pay for Performance Plan, each two-week pay period Roberts was eligible to receive performance (i.e., bonus) pay if he met the required performance and conduct standards. (Doc. 26-7 at ¶ 8, PageID.197-98; *see also* Doc. 26-7, PageID.201). Pursuant to the conditions of the Pay for Performance Plan, in addition to satisfying certain performance metrics, to be eligible for performance pay the employee's conduct must comply with company standards, and an employee who receives discipline or has an unexcused absence during a pay period is not eligible

for performance pay.  (Doc. 26-7 at ¶ 7, PageID.201).  Roberts was eligible to receive performance pay in both the checker and the picker roles.  (Doc. 26-6, PageID.153; *see also* Doc. 26-7 at ¶ 8, PageID.197-98).

### C.    Lang Incident

On August 16, 2019, Roberts' immediate supervisor, Pederson, submitted his resignation. (Doc. 26-2 at ¶ 6, PageID.117-18).  Gulf's HR Director, Susan Ames ("Ames") met with Pederson to discuss his stated reasons for resigning, and Pederson informed her that Lang spoke and behaved in a manner that had "racial undertones" that were offensive to African-American employees. (Doc. 26-2 at ¶ 6, PageID.117-18).  When Ames asked Pederson which employees he was referring to Pederson mentioned Roberts. (Doc. 26-2 at ¶ 6, PageID.117-18).  After meeting with Pederson, Ames first interviewed Roberts and then interviewed Lang.  (Doc. 26-2 at ¶ 7, PageID.118). During her interview of Roberts, Ames asked Roberts if he had ever witnessed Lang act in a racially offensive manner and Roberts informed Ames of three incidents where Lang acted offensively.  (Doc. 26-2 at ¶ 6, PageID.117-18). These included an incident where Lang grabbed a pick out of Roberts' hair and placed it down Lang's pants, another incident where Lang grabbed a durag from Roberts' hair, and an incident where Lang made an offensive comment.  (Doc. 26-2 at ¶ 7, PageID.118); Doc. 26-6, PageID.160).   When Ames interviewed Lang he did not deny the incidents but denied they were intended to be racially offensive. (Doc. 26-2 at ¶ 7, PageID.118).

Based on the information learned during her investigation, Ames determined Lang had violated the EEO policy and that discipline was appropriate. (Doc. 26-2 at ¶ 7, PageID.118).  After discussing the matter with Olson, the decision was made to escalate Lang to the final or near-

final step in Gulf's progressive discipline policy by placing him on suspension. (Doc. 26-2 at ¶ 7, PageID.118; Doc. 26-7 at ¶ 3, PageID.196). Additionally, Lang was transferred to the day shift to separate him from Roberts and was relieved of his employee management responsibilities, including the authority to participate in hiring, pay, discipline, and termination decisions. (Doc. 26-7 at ¶ 4, PageID.196). Further, Lang was required to complete re-training on Gulf's EEO policy and counseled that any further misconduct could result in termination. (Doc. 26-2 at ¶ 7, PageID.118; Doc. 26-7 at ¶ 4, PageID.196). Since the corrective action issued to Lang on or about August 21, 2019 there have been no other reports or complaints concerning offensive conduct or comments by Lang. (Doc. 26-2 at ¶ 9, PageID.118; Doc. 26-7 at ¶ 4, PageID.196). Roberts agrees that after Gulf learned of Lang's misconduct in August 2019 Gulf intentionally separated Roberts and Lang and Roberts no longer worked under Lang. (Doc. 26-6, PageID.181).

### D.      Roberts' Medical Event and Return to the Picker Role

Roberts suffers from epilepsy and is prone to seizures if he does not take his medication properly. (Doc. 26-6, PageID.194; *see also* Doc. 26-8 at ¶¶ 3-4, PageID.208-09). While working during the night shift on April 12, 2020, Roberts experienced what appeared to be a seizure because he forgot to take his medication. (Doc. 26-8 at ¶4, PageID.208-09; *see also* Doc. 26-8, PageID.215 & Doc. 26-8, PageID.216). The April 12, 2020 incident was not the first occasion Roberts experienced a seizure while at work because he failed to take his medication, and this happened on at least four prior occasions. (Doc. 26-8 at ¶ 4, PageID.208-09). On April 14, 2020, HR Generalist Suzanne Donaghey ("Donaghey") met with Roberts to discuss the incident, and as reflected in her notes from the meeting, Donaghey informed Roberts he would not be allowed

to work in roles requiring the use of heavy equipment, including in the checker role, until the company was satisfied that his seizures were under control. (Doc. 26-8 at ¶ 4, PageID.208-09; Doc. 26-8, PageID.216; *see also* Doc. 26-7 at ¶ 5, PageID.197).

**E.    Roberts' Altercation on April 21, 2020**

During the night shift on April 21, 2020 Roberts got into an altercation with another Load Crew employee, Percy Crumpton ("Crumpton"), who was working as a checker. (Doc. 26-4 at ¶ 5, PageID.138; Doc. 26-6, PageID.157; Doc. 26-7 at ¶ 6, PageID.197). Crumpton also is African-American. (Doc. 26-6, PageID.80). As Roberts admits, he and Crumpton had a history of not getting along and prior to the April 21 altercation Roberts called Crumpton a "snitch" on one or more occasions in front of other Load Crew employees. (Doc. 26-6, PageID.161; Doc. 26-4 at ¶ 5, PageID.138). The April 21 altercation was reported to Olson the following day by Warehouse manager Chris Schweizer ("Schweizer") and was investigated by Olson and Donaghey. (Doc. 26-4 at ¶ 5, PageID.138).

In connection with their investigation, Olson and Donaghey interviewed two eye witnesses to the incident, including Schweizer and a non-manager employee, Carrie Emslie ("Emslie"). (Doc. 26-4 at ¶¶ 5-6, PageID.138-39). According to Schweizer, Roberts became angered when Crumpton accidentally caused the Warehouse door to bump Roberts, which did not injure Roberts but nonetheless, Roberts began yelling at Crumpton and tried to fight him. (Doc. 26-4 at ¶ 5, PageID.138). Schweizer then instructed both Roberts and Crumpton to leave the Warehouse, but Roberts refused to back down and was shouting "let's fight" in close proximity to Crumpton's face. (Doc. 26-4 at ¶ 5, PageID.138). At that point, Schweizer instructed

Roberts to clock out and leave. (Doc. 26-4 at ¶ 5, PageID.138).  Schweizer confirmed that Crumpton did not initiate the altercation or respond to Roberts' efforts to bait him into fighting. (Doc. 26-4 at ¶ 5, PageID.138).  When Olson and Donaghey interviewed Emslie to obtain her account of the incident, she corroborated Schweizer's account and added that Roberts was "out of control" and that Crumpton did nothing to perpetuate the altercation.  (Doc. 26-4 at ¶ 6, PageID.138-39).

The April 21, 2020 incident was not the first time Roberts had antagonized a co-worker. (Doc. 26-4 at ¶ 7, PageID.139).  Accordingly, at the conclusion of Olson and Donaghey's investigation, Olson, with HR's approval, made the decision to suspend Roberts without pay for three days. (Doc. 26-4 at ¶ 7, PageID.139).  Crumpton was not disciplined because Olson and Donaghey determined he was not the aggressor and did not participate or escalate the altercation.  (Doc. 26-4 at ¶ 7, PageID.139).  Roberts agrees that both eye witnesses to the altercation, Schweizer and Emslie, confirmed during the investigation that Roberts was the aggressor in the altercation.[3]  (Doc. 26-6, PageID.176-77). For the most part, Roberts also does not dispute Schweizer's and Emslie's description of what occurred as set forth in Olson's declaration except that Roberts denies asking Crumpton to fight at work and testified that what he actually said to Crumpton is: "[i]f you want to fight, let's clock out and go across the street." (Doc. 26-6, PageID.174-175).  As an additional admission, when Roberts testified in his deposition concerning what occurred, he added that after the altercation Roberts apologized to Emslie "for

---

[3]      According to Roberts, HR should have interviewed his "witnesses" concerning the incident, but Roberts could not recall the identity of any other co-workers in the area who would have seen the incident. (Doc. 26-6, PageID #172).

catching an attitude" with Crumpton and "whooping and hollering" with Crumpton, explaining that Crumpton made Roberts mad. (Doc. 26-6, PageID.173). Roberts was suspended from work on April 22, 23 and 26, 2020 and returned to work on April 27, 2020. (Doc. 26-4 at ¶ 8, PageID139).

When Roberts returned to work, Olson met with Roberts to emphasize that fighting at work would not be tolerated and also informed Roberts that he would not be returned to working as a checker in an effort to separate Roberts from Crumpton and until Roberts could demonstrate he could work respectfully and as a team with his co-workers.[4] (Doc. 26-4 at ¶ 8, PageID.139). As Olson explains, the checker role is the most interactive and team oriented assignment under the Load Crew position. (Doc. 26-4 at ¶¶ 3-4, PageID.137-38). During the meeting, Olson provided Roberts with a record of counseling to document his misconduct and suspension, and Roberts signed the record to confirm his receipt. (Doc. 26-4 at ¶ 8, PageID.139; *see also* Doc. 26-4, PageID.141).

On April 29, 2020, Roberts sent an email to Donaghey claiming that his suspension and permanent removal from the checker role was based on his race and in retaliation for complaining about Lang's conduct more than eight months earlier in August 2019. (*See* Doc. 26-10). In his email to Donaghey, Roberts complained that being reassigned from the checker role would affect his pay because he would not be eligible for a bonus. (Doc. 26-10). However, Roberts clarified in his deposition that at the time of his email he believed he was being assigned

---

[4]     As mentioned, on the date of the altercation, Roberts had already been removed from the checker role, at least temporarily, due to his medical event on April 12, 2020. (Doc. 26-7 at ¶ 5, PageID.197; Doc. 26-8 at ¶ 4, PageID.208-09).

to the loader, not the picker role. (Doc. 26-6, PageID.185-86). It is undisputed that after the altercation, Roberts worked as a picker for the remainder of his employment other than a few isolated occasions, and Roberts agrees that as a picker he continued to be eligible for performance pay. (Doc. 26-6, PageID.153 & PageID.186).

Despite Roberts' dissatisfaction with being removed from the checker role, he testified his pay did not change as a result of the reassignment. (Doc. 26-6, PageID.179). While Roberts also testified he "felt" like he earned more in bonus or performance pay as a checker than as a picker, according to Roberts, there is "no way" he could quantify how much more. (Doc. 26-6, PageID.162-63). However, Gulf's payroll records, which Roberts agreed would be the most accurate source of his pay, establish that a comparison of Roberts' performance pay immediately after he was removed from the checker role did not decrease, and in fact, it actually increased. (Doc. 26-6, PageID.156; Doc. 26-8 at ¶ 6, PageID.209-10; *see also* Doc. 26-8, PageID.217-18).

The reassignment also did not affect Roberts' hours and Roberts continued working on the same shift and reporting to the same supervisor. (Doc. 26-6, PageID.179). Additionally, Roberts does not dispute that the picker assignment falls within the duties of the Load Crew Member position, and Load Crew employees are reassigned to the various roles based on operational needs and the employee's experience at the discretion of the Load Crew manager. (Doc. 26-6, PageID.154-55; Doc. 26-4 at ¶ 3, PageID.137-38). Roberts has not and cannot identify any comparators to support that the discipline he received for the altercation on April 21, 2020 was any harsher than similarly situated employees outside of his protected class. When asked in his deposition to identify any similarly situated employee he believes was treated more favorably,

Roberts identified only Crumpton, who as mentioned also is African-American.  (Doc. 26-6, PageID.185).  Following this testimony, Roberts was asked about any other comparators and testified:

> **Q.** **[Are] there any other similarly situated employees that you believe were treated more favorably?**
>
> **A.** **No.**

(Doc. 26-6, PageID.193-94).

Roberts admits that prior to complaining about his suspension and job assignment on April 29, 2020 the only other time he discussed alleged racial misconduct or discriminatory treatment with HR was when Ames interviewed him about Lang's misconduct in August 2019 after HR reached out to Roberts to question him concerning incidents that Pederson, not Roberts, reported.  (Doc. 26-6, PageID.183-84).

### F.    Roberts' EEOC Charge

On June 30, 2020, Roberts filed a charge with the EEOC claiming his suspension and assignment from the checker role to the picker (aka cart puller) role was based on his race and in retaliation for reporting the Lang incident in August 2019.[5]  (Doc. 26-11).  Roberts was still employed by Gulf when he filed his charge and there are no allegations in his charge related to the events that led to his termination.  Based on his charge and the EEOC's "Memorandum

---

[5]    Roberts continued to work for Gulf while his EEOC charge was pending.  Ames testified the EEOC charge, like all other sensitive HR matters, was handled discreetly, and none of Roberts' immediate supervisors or anyone outside of HR other than Olson knew of Roberts' charge.  (Doc. 26-2 at ¶ 10, PageID.118).

Recommendation for Closure," Roberts' allegations were limited to the Lang incident in August 2019 and alleged retaliation based on his suspension and reassignment after the altercation in April 2020. (Doc. 26-12). The EEOC considered this information and concluded that with respect to Roberts' allegations concerning Lang's misconduct, Gulf took "corrective disciplinary action against [Lang], who was suspended, trained and reassigned away from Roberts." (Doc. 26-12, PageID.256). Additionally, the EEOC determined that the reassignment and discipline issued to Roberts "were due to reasons other than his race and retaliation." (Doc. 26-12, PageID.256). The EEOC also noted that Roberts "has no comparators" to support that Gulf's actions were motivated by a racial or retaliatory motive. (Doc. 26-12, PageID.256). On April 13, 2021, the EEOC issued its notice of dismissal and right to sue letter dismissing Roberts' charge. (Doc. 26-13).

### G.     Roberts' Subsequent Misconduct and Last Chance Agreement

On or about October 19, 2020, Roberts was involved in two separate incidents of misconduct, one involving job performance and one involving another altercation with a different African-American co-worker, Antonio Murphy ("Murphy"), in the breakroom. (Doc. 26-7 at ¶¶ 9-11, PageID.198-99; Doc. 26-8 at ¶¶ 7-9, PageID.210-11; *see also* Doc. 26-6, PageID.187 (testifying Murphy is African-American). The performance issue related to discrepancies in Roberts' working hours (i.e., wasting time while on-the-clock) and improperly using his pick headset which caused his pick production statistics to appear higher than they actually were, which of course affected his performance pay. (Doc. 26-7 at ¶ 10, PageID.198; Doc. 26-8 at ¶ 8, PageID.210-11). A meeting with Roberts to discuss this incident was held on October 21, 2020,

and Roberts was reprimanded and received another record of counseling.  (Doc. 26-8 at ¶ 8, PageID.210-11; *see also* Doc. 26-8, PageID.219).

The altercation in the breakroom was investigated by Olson, Ames, and Donaghey who obtained written statements from Murphy and two eye witnesses to the incident, all of whom confirmed Roberts was "egging Antonio [Murphy] on" and "escalated" the disagreement by following Murphy as Murphy attempted to walk away and exit the breakroom.  (Doc. 26-7 at ¶ 11, PageID.199; Doc. 26-7, PageID.206-07).

Based on the two incidents, the decision was made to place Roberts on a last chance agreement, pursuant to which Roberts would be afforded one final chance to remain employed on the condition that he agreed to comply with all company policies going forward.  (Doc. 26-7 at ¶ 11, PageID.199).  Olson and Ames met with Roberts on October 22, 2020 to review the last chance agreement and made it very clear to Roberts that there would be no more chances and any further infractions or violations of company policy would lead to termination.   (Doc. 26-7 at ¶¶ 9-11, PageID.198-99; Doc. 26-7, PageID.204-05).   Prior to ending the meeting, Robert was provided and signed the last chance agreement.  (Doc. 26-7, PageID.204-05).

H.    **Roberts' Unexcused Absence and Termination**

On Monday January 11, 2021, Roberts did not report to work.  (Doc. 26-8 at ¶ 11, PageID.211). On January 10, 2021, Roberts mentioned to his immediate supervisor at the time, Theo Fore ("Fore"), that he wanted to be off the next day to attend a doctor's appointment, which was actually a routine dentist appointment.  (Doc. 26-8 at ¶ 14, PageID.212-13; *see also*

Doc. 26-8, PageID.230; Doc. 26-6, PageID.169-70 (testifying the appointment was for a teeth cleaning and X-rays)). This made little sense since Roberts shift did not begin until 4:00 P.M at the earliest. (Doc. 26-8 at ¶ 14, PageID.212-13). Moreover, shortly after Roberts mentioned his doctor's appointment, Fore overheard Roberts tell another co-worker he would not be at work on January 11, 2021, which also was the date of the NCAA National Championship game between Alabama and Ohio State, because he would be home getting ready to watch the game. (Doc. 26-8 at Att. 8, PageID.230; Doc. 26-8 at ¶ 11, PageID.211; *see also* Doc. 26-6, PageID.165 and PageID.190 (testifying he is an Alabama fan and watched the championship game on January 11, 2021). In any event, Roberts' request to be off was never approved. (Doc. 26-8 at ¶ 11, PageID.211).

Pursuant to Gulf's attendance policy discussed, *supra*, Roberts' unauthorized absence on January 11, 2021 violated Gulf's attendance policy and Roberts' last chance agreement. (Doc. 26-8 at ¶ 13, PageID.212; Doc. 26-7 at ¶ 12, PageID.199). Accordingly, the decision was made to terminate his employment. The termination decision was made jointly by Olson, Ames, and Donaghey, and no one else participated in approving the decision.[6] (Doc. 26-8 at ¶ 13, PageID.212). Donaghey met with Roberts on January 19, 2021 to communicate the decision and provided Roberts with a termination form stating the reason for his termination: "[o]n October 20, 2020, Josh [Roberts] was put on a last chance agreement. On 1/11/2021 he had on an

---

[6] Roberts testified he believes Lang was somehow involved in the decision to terminate his employment because according to Roberts, Lang and Olson are friends. (Doc. 26-6, PageID.191 (testifying he has no other basis for concluding Lang was involved)). Without identifying facts to support his belief or any evidence filed in response to Gulf's Motion, Roberts' testimony concerning his belief about Lang's involvement is pure conjecture.

unexcused absence, which is a violation of our company attendance policy." (Doc. 26-8 at ¶ 14, PageID.212-13; Doc. 26-8, PageID.229 (emphasis added)). Donaghey signed the form and Roberts signed the form to confirm his receipt.[7] (Doc. 26-8, PageID.229).

In his deposition, Roberts testified he understood his absence on January 11, 2021 had been approved because he saw the "approved" status of his request in the Paylocity Time Off Request Report ("TORR") and suspects that someone must have changed the status to "denied." (Doc. 26-6, PageID.167-68). Roberts' speculative testimony is contradicted by the TORR. As Donaghey explains, employee requests for time off are entered through the self-service portal in Paylocity, Gulf's attendance and scheduling software, and the information is stored in the TORR. (Doc. 26-8 at ¶ 15, PageID.213). Once a request is entered in the TORR, the status of the request is marked as "approved," "denied," "cancelled" or "pending," and once marked the approval status cannot be altered in the system. (Doc. 26-8 at ¶ 15, PageID.213). The TORR for January 2021 does not include any request for time off made by Roberts; obviously, if the request was never entered in the system, it is not possible for Roberts to have seen the status marked as "approved."[8] (Doc. 26-8 at ¶ 15, PageID.213; Doc. 26-8 at PageID.231-47 and PageID.248). Further, Roberts does not dispute that he failed to comply with other components of Gulf's

---

[7] The termination form contains a typo and mistakenly checks the box termination at will by employee, instead of employer. Roberts agrees this is a typo and that Gulf terminated his employment. (Doc. 26-6, PageID.188-89).

[8] Donaghey, the custodian of the TORR records, verified in her declaration that the reports related to Roberts filed with Gulf's Motion are true and correct. (Doc. 26-8 at ¶ 15).

attendance policy, including requesting time off at least five days in advance and scheduling personal appointments during non-working hours.

There is no other employee at Gulf who has violated the attendance policy while under a last chance agreement for repeated incidents of misconduct who remained employed. (Doc. 26-7 at ¶ 13, PageID.199). As Olson stated, any other employee who engaged in misconduct similar to Roberts also would have been terminated. (Doc. 26-7 at ¶ 13, PageID.199). Roberts agrees he also has no comparators with regard to his termination claim. When asked in his deposition if he could identify any non-African-American employee who was under a last chance agreement, he testified "no." (Doc. 26-6, PageID.192). Roberts admits Lang is the only individual who made a racially offensive comment or engaged in racially offensive behavior. (Doc. 26-6, PageID.192). He further acknowledged he has no information to support that Lang participated in the decision to suspend him. (Doc. 26-6, PageID.180). Aside from Roberts' speculation based on Lang's alleged friendship with Olson, Roberts admits he has no evidence that Lang was involved in the decision to terminate his employment. (Doc. 26-6, PageID.180).

## IV.    LEGAL ANALYSIS AND CONCLUSIONS

### A.    Roberts' Failure to Exhaust Administrative Remedies for His Termination Claim

To prosecute a claim for discrimination under Title VII, a plaintiff must first exhaust administrative remedies, beginning with the filing of a charge of discrimination with the EEOC. *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004). While judicial claims not included in the EEOC charge are allowed if they "amplify, clarify, or more clearly focus" the

allegations in the charge, the Eleventh Circuit has cautioned that allegations of new acts of discrimination are inappropriate. *Id*. at 1279-80 (internal quotations omitted). Where a plaintiff alleges discrete acts of alleged discrimination that occur after the filing of his charge and prior to filing his lawsuit, to satisfy the requirement that he first exhaust his administrative remedies, he must amend his EEOC charge or file a separate charge. *See Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 892-93 (11th Cir. 2014).[9] *See also Robinson v. Koch Foods of Alabama*, No. 2:13-CV-557-WKW, 2014 WL 4472611 (M.D. Ala. Sept. 11, 2014) (applying *Duble* and dismissing retaliatory termination claim that arose post-charge and pre-suit for failure to exhaust administrative remedies).[10]

Roberts' EEOC charge was filed on June 30, 2020 and alleges only race discrimination and retaliation based on the Lang incident in August 2019 and his suspension and reassignment following the altercation with Crumpton in April 2020. (Doc. 26-11). Roberts' termination on January 19, 2021 occurred while his EEOC charge was still pending and prior to the filing of his lawsuit on July 6, 2021. (Doc. 1). Roberts' termination was based on new events unrelated to

---

[9]     In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

[10]     In *Duble*, the Eleventh Circuit limited a prior line of cases holding the administrative exhaustion requirement is satisfied where a termination claim arises after suit is filed but grew out of the same allegations in an earlier charge. *Id.* at 892-93 (distinguishing *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981) and *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168-69 (11th Cir. 1988)). The *Duble* Court held that *Gupta* and *Baker* do not apply to discrete acts of discrimination that occur after filing a charge and before the complaint is filed. *Id.* at 893.

the Lang incident or the alleged retaliatory suspension and reassignment. As such, to prosecute a claim based on his alleged discriminatory or retaliatory termination, it was incumbent on Roberts to first exhaust his administrative remedies by amending his EEOC charge or filing a new charge.  During the August 25, 2022 hearing, Roberts admitted he did not amend his charge.

Therefore, the undersigned finds that Roberts failed to exhaust his administrative remedies with respect to his termination claim and that claim is barred.  However, even assuming Roberts' termination claim were not barred, for the additional reasons discussed below, Roberts' termination claim still fails.

B.  **Roberts' Prima Facie Case for Discrimination Based on His Suspension and Reassignment or His Termination**

**Title VII – Race Discrimination – Controlling Law**

To prove his race discrimination claim, Roberts may use either direct or circumstantial evidence.  *Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1086 (11th Cir. 2004), *abrogated on other grounds by Ash v. Tyson Foods, Inc*., 546 U.S. 454 (2006)). "Direct evidence is evidence that 'if believed, proves the existence of a fact without inference or presumption.' " *Todd v. Fayette Cty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) (quoting *Fernandez v. Trees, Inc.,* 961 F.3d 1148, 1156 (11th Cir. 2020)). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  *Id.*  Further, only statements by individuals involved in the decisionmaking process can constitute direct evidence of discrimination.  *Wright v. Southland Corp*., 187 F.3d

1287, 1298-99 (11th Cir. 1999) (collecting cases). Roberts admits Lang is the only individual who made comments or engaged in conduct that was racially offensive, but there is no evidence to suggest that Lang was involved in making any of the employment decisions Roberts challenges. During the August 25, 2022 hearing, Roberts did not dispute that he has no direct evidence to support his claims. As such, Roberts' claims based on circumstantial evidence are appropriately analyzed under the burden-shifting framework established by *McDonnell Douglas*. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case, Roberts must show: (1) that he belongs to a protected class, (2) that he was subjected to an adverse employment action, (3) that he was qualified to perform the job in question, and (4) that the employer treated "similarly situated" employees outside his class more favorably. *Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019). To establish an adverse employment action, a plaintiff must demonstrate "'a serious and material change in the terms, conditions, or privileges of employment.'" *Sampath v. Immucor, Inc.*, 271 F. App'x. 955, 962 (11th Cir. 2008) (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1243-44 (11th Cir. 2001), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). To establish the fourth element, the plaintiff must present evidence of a comparator, i.e., someone who is similarly situated "in all material respects." *Lewis*, 918 F.3d at 1227-28.

Only if the plaintiff succeeds in making a prima facie case does the burden shift to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Lewis,* 918 F.3d at 1221. If the defendant meets its burden, "the presumption of discrimination is rebutted, and the

burden of production shifts to the plaintiff to offer evidence that the alleged reason[s] of the employer [are] pretext for illegal discrimination." *Wilson*, 376 F.3d at 1087.

### Roberts' Prima Facie Claim

Roberts has failed to establish the fourth element (a proper comparator) with respect to each of his alleged adverse employment actions. Additionally, with respect to the alleged reassignment of his job duties, Roberts also has failed to establish the second element, an actionable adverse employment action.

First, it is undisputed that Roberts cannot identify a similarly situated employee *outside* his protected class who was involved in an altercation with a co-worker under similar circumstances and was not disciplined in the same manner as Roberts. The only individual Roberts has identified who he believes was treated more favorably is Crumpton. Crumpton is not a valid comparator because he also is African-American, and moreover, Crumpton's conduct in the altercation is distinguishable from Roberts' because Crumpton was not the aggressor. It also is undisputed that Roberts cannot identify a comparator for his termination claim. Roberts' prima facie case for discrimination fails for this reason alone.

Second, Roberts' reassignment from the checker role is not an adverse employment action. It did not result in a decrease in his pay or benefits, did not affect his hours, and did not materially or significantly impact his job duties. Further, Gulf has established that Roberts had already been removed from the checker role for medical reasons and due to safety concerns before the Crumpton altercation. Regardless, the checker and picker roles fall within the job description of the Load Crew Member position. Roberts' subjective preference for the checker

role over the picker role without any evidence of an adverse impact on the material terms or conditions of his employment does not demonstrate an actionable adverse employment action. *See Davis*, 245 F.3d at 1243-44 (employee's subjective opinion that reassignment was a loss of prestige is not an actionable adverse employment action); *Sampath*, 271 F. App'x. at 962 (reassignment of duties where salary, hours, benefits, and title are unchanged, was not a serious enough change in employment to constitute adverse employment action despite supervisor's subjective view that reassignment was adverse).

### C. Roberts' Retaliation Claim

To establish a prima facie case for retaliation, the plaintiff must show: "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (citing *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009)). After a plaintiff establishes a prima facie case, the same burden-shifting analysis that applies in the context of a Title VII discrimination claim applies. *Bryant*, 575 F.3d at 1308.

### Roberts' Prima Facie Claim

The only protected activity Roberts identifies in his Complaint is reporting Lang's misconduct to HR in August 2019 and the filing of his EEOC charge in June 2020.[11] Gulf agrees this evidence satisfies the first element of his prima facie claim for retaliation.

---

[11]    Roberts' Complaint states his charge was filed on August 1, 2020.  (Doc. 1 at ¶ 13: PageID.3).  In fact, according to the EEOC's filing stamp, his charge was filed June 30, 2020.  (Doc. 26-11).

The only alleged adverse employment actions Roberts arguably identifies in his Complaint are the reassignment of his job duties and suspension after the Crumpton altercation in April 2020 and his termination on January 19, 2021. Roberts' reassignment was not an adverse employment action for the reasons already discussed, and Roberts has not satisfied the second element of his claim with respect to this theory. Termination and suspension without pay clearly are adverse employment actions, and Gulf agrees Roberts has satisfied the second element of his prima facie retaliation claim concerning those actions. However, Gulf asserts that Roberts has not satisfied the third element with respect to any of his retaliation theories because he has not demonstrated the necessary causal link between his protected activity and alleged adverse employment action.

"To show causation, a plaintiff in a retaliation case need prove only that retaliatory animus was one factor in the adverse employment decision." *Brown*, 597 F.3d at 1182 (11th Cir. 2010). "But when there is a substantial delay between the protected activity and the adverse action, a plaintiff must submit other evidence supporting causation to survive summary judgment." *Cooler v. Layne Christensen Co.*, 710 F. App'x. 842, 845 (11th Cir. 2017).

Roberts offers no evidence of causation other than temporal proximity. Roberts reported the Lang incident in August 2019, eight (8) months prior to his suspension and reassignment and seventeen (17) months prior to his termination. Roberts filed his EEOC charge on June 30, 2020, seven (7) months prior to his termination. Roberts' suspension and reassignment predated the filing of his charge and obviously his charge was not a factor in those decisions. In sum, the temporal proximity Roberts relies on to show causation ranges from 7 – 17 months.

This court and numerous other courts in the Eleventh Circuit have held that this is far too remote to support the necessary causal link. *Larry v. City of Mobile*, No. 1:19-CV-1008-TFM-MU, *14, 2022 WL 1131718 (S.D. Ala. Apr. 15, 2022) (six month temporal proximity standing alone was insufficient evidence of causation; granting summary judgment on retaliation claim); *Gilliam v. United States VA*, 822 F. App'x 985, 990 (11th Cir. 2020) (three months is too long to permit an inference of causation based on temporal proximity alone); *Walker v. Sec'y, U.S. Dep't of Air Force*, 518 F. App'x 626, 628 (11th Cir. 2013) (a three-to-four month time gap is insufficient); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) ("A three to four month disparity ... is not enough.").

The temporal proximity between Roberts' protected activity and alleged adverse actions well exceeds the closeness in time required to establish causation absent other evidence indicating the employment decisions were retaliatory. Roberts' failure to produce evidence of causation is fatal to his prima facie claim.

Based on the foregoing analysis and consideration of all pertinent undisputed facts, Roberts has failed to establish a prima facie case for Title VII discrimination or retaliation. While this ends the *McDonnell Douglas* analysis, the undersigned has continued the anlaysis by evaluating Gulf's proffered legitimate, nondiscriminatory and nonretaliatory reasons for its decisions to suspend, reassign, and terminate Roberts and Roberts' evidence of pretext.

D.      <u>**Gulf's Articulated Reasons for Its Employment Actions and Roberts' Evidence of Pretext Gulf's Proferred Legitimate, Nondiscriminatory and Non-Retaliatory Reasons**</u>

An employer's burden to articulate legitimate, nondiscriminatory and nonretaliatory reasons for its employment decisions is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). The Eleventh Circuit has held that "if the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is 'not because of race' ...." *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987); *see also Howard v. Jackson Cty. Health Care Auth., Civ. Act.* No. 5:15-393, 2016 WL 2766782, at *12 (N.D. Ala. May 13, 2016) ("An employer's honest belief that an employee violated a company policy constitutes a legitimate, nondiscriminatory reason for termination.") (collecting cases). Gulf's preferred reasons for the challenged decisions include: (i) Roberts was initially reassigned from the checker role due to Roberts' medical event and concerns over allowing him to operate machinery; (ii) Roberts was not returned to the checker role following his altercation with Crumpton in an effort to separate Roberts and Crumpton; (iii) Roberts was suspended as discipline for the altercation with Crumpton; and (iv) finally, Roberts was terminated for violating the attendance policy while under a last chance agreement. The undersigned finds that Gulf has met its burden of articulating legitimate, nondiscriminatory and nonretaliatory reasons for its decisions, shifting the burden to Roberts to show Gulf's reasons are pretextual.

## Roberts' Evidence of Pretext

To show pretext in the discrimination or retaliation context, Roberts' burden is to show both that the reason was false, and that discrimination or retaliation was the real reason. *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (discrimination);

*Gogel v. Kia Motors Mfg. of Ga*., 967 F.3d 1121, 1136 (11th Cir. 2020) (retaliation). To establish pretext, Roberts "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Gulf's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atlantic Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quotations omitted). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Id.* Thus, in considering whether a plaintiff has shown the employer's stated reasons are false, the proper "inquiry is what the employer in good faith believes the employee to have done, not whether the employee actually engaged in the particular conduct." *Gogel*, at 1149.

As Gulf's Motion sets out, Roberts can point to no inconsistencies or contradictions in Gulf's stated explanations for its employment decisions. Further, he has no comparator evidence to show Gulf applied its policies inconsistently or more harshly with respect to Roberts. While Roberts disagrees that the misconduct Gulf relies on for making its decisions justified the discipline he received or terminating his employment, Roberts has offered no evidence that the decisions were motivated by a discriminatory or retaliatory animus. Instead, Roberts simply quarrels with the wisdom and appropriateness of Gulf's decisions.[12] This is insufficient as a matter of law to show pretext. *See, e.g., Larry*, 2022 WL 1131718 at * 9 (plaintiff's unsupported statement and mere belief that employer's decisions were motivated by racial animus was

---

[12] While Roberts testified he believed his request to be absent on January 11, 2021 was approved, even if true, this does not demonstrate that Gulf lacked an honest or reasonable belief that Roberts disregarded the proper process for requesting time off and failed to obtain prior approval for his absence.

insufficient to show pretext); *Thomas v. Ashton & Co., Inc.*, No. 1:19-CV-48-TFM-M, 2021 WL 640815, at *8 (S.D. Ala. Feb. 18, 2021) ("the Court finds that the pretext element has not been met because Thomas has failed to establish that Dyess acted dishonestly in his investigation and decision to terminate Thomas's employment and that discrimination was the real reason for his termination"; granting summary judgment).

Despite Roberts' failure to file evidence to rebut Gulf's proffered explanations, during the August 25, 2022 hearing, Roberts was asked to identify any evidence he could file if permitted additional time. In response, Roberts identified three individuals who could provide testimony to support the discriminatory treatment by Lang that occurred in August 2019. Again, Lang was not involved in the decision to suspend and reassign Roberts made in April 2020 or the decision to terminate his employment in January 2021. Moreover, while Lang's conduct was offensive, Gulf took prompt corrective action to address Lang's misconduct by suspending Lang, stripping Lang of his personnel-related management duties, reassigning Lang to the day shift so he would not work with Roberts, and requiring Lang retrain on the EEO policy. Gulf has submitted evidence to support that following its corrective action there were no other reported incidents or complaints involving similar misconduct by Lang. This indicates Gulf's corrective action also was effective. There simply is no evidence that Gulf ignored or condoned Lang's treatment of Roberts that might suggest a racial animus or bias with respect to any of the subsequent employment decisions that are now at issue. Roberts' reliance on the Lang incident is misplaced and fails to show pretext. Further, for the additional reason discussed below, the Lang incident is time barred and any evidence to bolster what occurred between Lang and Roberts would not support an actionable claim for race discrimination.

After reviewing all pertinent facts and considering the parties' respective arguments, it is determined that the reasons articulated by Gulf for Roberts' adverse employment actions are legitimate, non-discriminatory and nonretaliatory reasons and were not merely a pretext to mask discrimination or retaliation. Although it was his burden, Roberts failed to present any evidence, much less sufficient evidence, that would permit a reasonable fact finder to conclude that the legitimate reasons proffered by Gulf were false or were a pretext for discrimination.

E.    **The Lang Incident Is Time Barred.**

As Gulf asserts in its Motion, the only relevance of the Lang incident is to establish a protected activity. Roberts has not pled a hostile work environment claim, and even if he had, a claim based on the Lang incident would be time barred. In a non-deferral state, like Alabama, a plaintiff must file his EEOC charge within 180 days after the date of the alleged discrimination or the claim is barred. 29 C.F.R. § 1626.7(a); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1220 (11th Cir. 2001). The Lang incident occurred sometime before Roberts reported it to HR on or about August 16, 2019. Roberts' EEOC charge was filed approximately 319 days later on June 30, 2020. Any claim Roberts could attempt to assert based on the Lang incident is time barred.

V.    **CONCLUSION**

Based on the foregoing, it is RECOMMENDED that Defendant Gulf Distributing Holdings, LLC's Motion for Summary Judgment (Doc. 26) should be GRANTED as to each of Plaintiff Roberts' claims, which should be DISMISSED WITH PREJUDICE.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. Gen. L.R. 72(c)(1) & (2). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE and ORDERED this the 7th day of September 2022.

s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE